UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL OGILVIE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>STEVE GORDON,<br><br>    Defendant. | Case No. 20-cv-01707-JST<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: ECF No. 26 |

Before the Court is Defendant's motion to dismiss. ECF No. 26. The Court will deny the motion.

## I.    BACKGROUND

For the purposes of this motion to dismiss, the Court takes the following factual allegations to be true. *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1092 (9th Cir. 2020) ("We accept the complaint's well-pleaded allegations as true and construe all inferences in the light most favorable to the nonmoving party.").

The California Department of Motor Vehicles ("DMV") offers an "Environmental License Plate" program that allows California residents to request license plates with customized alphanumeric combinations.[1] ECF No. 1 ("Compl.") ¶ 21. "Individuals applying for Environmental License Plates must pay a registration fee, as well as annual renewal fees. The fees collected are used to support environmental programs." *Id.* ¶ 22. Requested plate configurations must be approved by the DMV, which "may refuse to issue any combination of letters or numbers,

---

[1] Environmental License Plates are distinct from "special interest plates," which "have a design or contain a message that publicizes or promotes a state agency, or the official policy, mission, or work of a state agency." Cal. Veh. Code § 5154.

or both, that may carry connotations offensive to good taste and decency or which would be misleading." Cal. Veh. Code § 5105(a). The implementing regulations instruct the DMV to "refuse any configuration that may carry connotations offensive to good taste and decency, or which would be misleading, based on criteria which includes, but is not limited to, the following:

> 1. The configuration has a sexual connotation or is a term of lust or depravity.
>
> 2. The configuration is a vulgar term; a term of contempt, prejudice, or hostility; an insulting or degrading term; a racially degrading term; or an ethnically degrading term.
>
> 3. The configuration is a swear word or term considered profane, obscene, or repulsive.
>
> 4. The configuration has a negative connotation to a specific group.
>
> 5. The configuration misrepresents a law enforcement entity.
>
> 6. The configuration has been deleted from regular series license plates.
>
> 7. The configuration is a foreign or slang word or term, or is a phonetic spelling or mirror image of a word or term falling into the categories described in subdivisions 1. through 6. above.

Cal. Code Regs. tit. 13, § 206.00(c)(7)(D). The DMV may also "cancel and order the return of any environmental license plate heretofore or hereafter issued" with a configuration that it "determines carries connotations offensive to good taste and decency or which would be misleading" based on these criteria. Cal. Veh. Code § 5105(b); *see also* Cal. Code Regs. tit. 13, § 206.12(a).

Plaintiffs Paul Ogilvie, James Blair, Amrit Kohli, Andrea Campanile, and Paul Crawford are California residents whose requests for personalized license plates were denied by the DMV under Section 206.00(c)(7)(D). Compl. ¶¶ 29-44. Ogilvie is an Army veteran who requested the plate configuration "OGWOOLF," which reflects his military nickname, "OG," and an old screen name, "WOOLF." *Id.* ¶¶ 29, 31. The DMV "thought that the configuration 'contain[ed] a reference to gang affiliation.'" *Id.* ¶ 32 (alteration in original). Blair, a "long-time fan of the rock band 'Slayer,'" requested the configuration "SLAAYRR." *Id.* ¶¶ 33-34. The DMV rejected his submission on the ground that it was "threatening, aggressive, or hostile." *Id.* ¶ 35. Kohli "is gay,

and established Queer Folks Records in an effort to reclaim the word 'Queer.'" *Id.* ¶ 36. The DMV rejected his request for the configuration "QUEER" because it considered the configuration "insulting, degrading, or expressing contempt for a specific group or person." *Id.* ¶ 37. Campanile, who owns two Ducati motorcycles, requested the configuration "DUK N A," which she intended to mean "Ducati and Andrea." *Id.* ¶¶ 38, 40. The DMV rejected the configuration "because it believed it 'profane or obscene.'" *Id.* ¶ 41.[2] Crawford owns Shakespeare Pub, whose slogan is, "Real beer, proper food, no bollocks." *Id.* ¶ 42-43. The DMV rejected his proposed configuration of "BO11LUX" because "the Department thought it had 'a discernable sexual connotation or may be construed to be of a sexual nature.'" *Id.* ¶ 44.

On March 10, 2020, Plaintiffs filed their complaint against Steve Gordon in his capacity as the Director of the DMV. *Id.* ¶ 14. The complaint makes a single claim, arguing that Section 206.00(c)(7)(D) "imposes content-based and viewpoint-based restrictions on speech" and is therefore facially unconstitutional under the First Amendment. *Id.* ¶¶ 47, 54. Plaintiffs seek declaratory and injunctive relief as well as attorney's fees and costs. *Id.* at 9.

Gordon filed the instant motion to dismiss on June 2, 2020. ECF No. 26. Plaintiffs filed an opposition, ECF No. 28, and Gordon replied, ECF No 29. The Court held a hearing on the motion on July 8, 2020.

## II.   JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

## III.   LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To satisfy Rule 8 and survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[2] Defendant explains in his motion to dismiss that "DMV rejected the application because the configuration could be read as a sound-alike version of a 'profane or obscene' phrase." ECF No. 26 at 11 (citing Compl. ¶ 41.)

3

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## IV. DISCUSSION

Gordon first argues that "the registration numbers displayed on California license plates are government speech" and thus not subject to the First Amendment. ECF No. 26 at 14. Even if personalized license plates were private speech, Gordon argues, the challenged regulation "constitutionally prohibits certain kinds of configurations" and thus is not facially unconstitutional. ECF No. 26 at 26.

### A. Government Speech

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). For this reason, the Court must first determine whether Environmental License Plates are government or private speech. *See Hart v. Thomas*, 422 F. Supp. 3d 1227, 1231 (E.D. Ky. 2019).

*Walker* considered Texas's specialty license plate program, in which non-profits submitted specialty plate designs to the Texas DMV Board, which could reject the designs if they "might be offensive to any member of the public . . . or for any other reason established by rule." 576 U.S. at 205 (citation omitted). In determining whether the license plate designs were government speech, the Court considered three factors: (1) whether the government had historically used the designs to "communicate[] messages from the States"; (2) whether Texas license plate designs are "often closely identified in the public mind with the [State]"; and (3) the degree to which "Texas

4

maintain[ed] direct control over the messages conveyed on its specialty plates." *Id.* at 211-13 (second alteration in original) (citing *Summum*, 555 U.S. at 470-73).

The Court held that the first factor weighed in favor of the government because, "insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States," for example, "to urge action, to promote tourism, and to tout local industries." *Id.* at 210-11. As to the second factor, the Court observed that "Texas license plates are, essentially, government IDs" and that "'persons who observe' designs on IDs 'routinely – and reasonably – interpret them as conveying some message on the [issuer's] behalf.'" *Id.* at 212 (alteration in original) (quoting *Summum*, 555 U.S. at 471). "Indeed, a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate." *Id.* Third, Texas had "'effectively controlled' the messages [conveyed] by exercising 'final approval authority' over their selection." *Id.* at 213 (alteration in original) (quoting *Summum*, 555 U.S. at 473). Taken together, the Court held that these factors indicated that the license plate designs were government speech. *Id.* at 213-14.

*Walker* explicitly did not consider whether the alphanumeric combinations approved via Texas's personalization program were government speech. *Id.* at 204. Of the four courts that, to the Court's knowledge, have attempted to answer this question since, three have concluded that personalized license plate numbers are private speech. *See Hart*, 422 F. Supp. 3d at 1233; *Kotler v. Webb*, No. CV 19-2682-GW-SKx, 2019 WL 4635168, at *8 (C.D. Cal. Aug. 29, 2019); *Mitchell v. Md. Motor Vehicle Admin.*, 450 Md. 282, 293-296 (2016); *but see Comm'r of Ind. Bureau of Motor Vehicles v. Vawter*, 45 N.E.3d 1200, 1207 (Ind. 2015) (holding that personalized license plate numbers are government speech). This Court agrees with these courts' conclusion.

First, the State has not historically used the alphanumeric combinations on license plates to communicate messages to the public. Although California may have "historically relied upon registration numbers displayed on license plates to convey a vehicle's status as validly registered and its specific identity," ECF No. 26 at 16, displaying information is not the equivalent of

5

sending messages. License plate numbers "do not express a government-approved message in the same way as specialty plate designs," *Kotler*, 2019 WL 46351468, at *7, which states have used "to urge action, to promote tourism, and to tout local industries," *Walker*, 576 U.S. at 211. "To the extent the individual registration number configurations broadcast any message at all, it is only because the state has allowed individual drivers to pick some combination of letters and numbers that carries significance to the driver." *Kotler*, 2019 WL 46351468, at *7. *Walker* itself acknowledged this distinction, stating that "the history of license plates shows that, insofar as license plates have conveyed *more than state names and vehicle identification numbers*, they long have communicated messages from the States." *Walker*, 576 U.S. at 210-11 (emphasis added).

Second, "it strains believability to argue that viewers perceive the government as speaking through personalized vanity plates." *Kotler*, 2019 WL 46351468, at *7. Although Californians may understand that personalized plates are "approved, manufactured, and issued by the State, and interpret [them] as conveying information on behalf of the State," ECF No. 26 at 18, it does not follow that Californians believe that the State is using the plates to send a message. Does the State seriously argue that someone viewing the license plate "KNG KOBE," for example, would infer that the California government was declaring Kobe Bryant the king of basketball, or of California, or of something else? *See* Gary Klein, *Lakers Fan Pays Tribute To Kobe Bryant With His "KNG KOBE" Truck*, L.A. Times (Jan. 28, 2020, 1:14 PM), https://www.latimes.com/sports/liveblog/kobe-bryant-dies-in-helicopter-crash-in-calabasas#lakers-fan-pays-tribute-to-kobe-bryant-with-his-kng-kobe-truck. Or that California believes that its coastline belongs to the holder of the vanity license plate reading "MY COAST"? *See* Raphael Tulino, *Taxes: Your Vanity Plates May Be Deductible*, Orange Cty. Register (Nov. 20, 2011, 10:00 AM), https://www.ocregister.com/2011/11/20/taxes-your-vanity-plates-may-be-deductible/.

The Court of Appeals of Maryland made this distinction in evaluating a challenge to that state's vanity license plate restrictions brought by an individual whose license plate reading "MIERDA," a Spanish swear word, had been rescinded. *Mitchell*, 450 Md. at 287-88. That court determined that "vanity plates bear unique, personalized, user-created messages that cannot be

attributed reasonably to the government," despite the fact that the "speech takes place on government property." *Id.* at 294. This was demonstrated by the fact that "the perception of a governmental imprimatur is what makes 'MIERDA' arguably clever or humorous in the first place," insofar as a viewer might understand "that the vehicle owner, not the government, is the speaker, and that the speaker implicated the State in a private message that, surprisingly, the government permitted, but certainly did not endorse." *Id.* at 295.

This conclusion is supported by "the sheer number of personalized Environmental License Plates" on California's roads. *Kotler*, 2019 WL 4635168, at *8. As the Supreme Court remarked in holding that registering a trademark does not transform it into government speech, "[i]f the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently. It is saying many unseemly things. It is expressing contradictory views. It is unashamedly endorsing a vast array of commercial products and services." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017) (internal citation omitted). "To suggest that the state has somehow meticulously curated the message of each of" the hundreds of thousands of personalized license plates it approves "is nonsensical." *Kotler*, 2019 WL 4635168, at *7; *compare Walker*, 576 U.S. at 221 (Alito, J., dissenting) (noting that Texas had approved around 350 different specialty plate designs). Rather, "common sense dictates that the public attributes any message on an Environmental License Plate to the driver." *Kotler*, 2019 WL 4635168, at *7.

As for the third factor, the California DMV at first glance appears to exercise a degree of control over Environmental License Plates similar to the control that the Texas DMV Board exercised over the specialty designs in *Walker*. As in *Walker*, where the Board had to "approve every specialty plate design proposal before the design [could] appear on a Texas plate" and "actively exercised this authority" by rejecting at least a dozen proposals, 576 U.S. at 213, Plaintiffs allege that the DMV actively exercises final approval authority over proposed Environmental License Plates by denying more than 30,000 applications per year, *see* Compl. ¶¶ 2, 24. But *Walker* based its control analysis on *Summum*, which evaluated a municipality's decision to erect certain donated statues, but not others, in a public park. *See Walker*, 576 U.S. at

210; *Summum*, 555 U.S. at 465-66. Because "the City ha[d] selected those monuments that it want[ed] to display for the purpose of presenting the image of the City that it wishe[d] to project to all who frequent[ed] the Park," the Court found that it had "'effectively controlled' the messages sent by the monuments in the Park." *Id.* at 473 (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560-61 (2005)). In applying *Summum* to Texas's specialty license plates, the Court found a similar degree of control because the Board's "final approval authority allow[ed] Texas to choose how to present itself and its constituency." *Walker*, 576 U.S. at 213.

As discussed above, however, California's personalized license plates do not send any message on behalf of the State and thus do not present an "image" of the State or its constituency. The fact that the government exerts regulatory control over speech cannot, on its own, transform that speech into government speech. *See Tam*, 137 S. Ct. at 1758 ("If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints."). *Tam* reckoned with this question in the context of federal trademarks, which private parties submit to the government for approval. *Id.* at 1758. Before *Tam*, the Patent and Trademark Office was required to approve trademarks unless they met certain defined criteria, such as being too similar to an already registered mark. *Id.* at 1753, 1758. The plaintiff in that case challenged one of these criteria, which prohibited the registration of a trademark "which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." *Id.* at 1753 (citation omitted).

The government made the same argument in *Tam* that California makes here: that regulatory control of private speech helps transform that speech into government speech. *See id.* at 1757-58; ECF No. 26 at 19-21. The *Tam* Court noted that other than the contested prohibition, "the viewpoint expressed by a mark has not played a role in the decision whether to place it on the principal register." *Tam*, 137 S. Ct. at 1760. This aligned with the Court's conclusion that "[t]rademarks have not traditionally been used to convey a Government message" and that "there is no evidence that the public associates the contents of trademarks with the Federal Government." *Id.* The Court thus found it "far-fetched to suggest that the content of a registered mark is

government speech." *Id.* at 1758. Such a holding "would constitute a huge and dangerous extension of the government-speech doctrine," because "if the registration of trademarks constituted government speech, other systems of government registration could easily be characterized in the same way." *Id.* at 1760.

California's argument in this case raises the same concern. Other than the challenged provision requiring the DMV to "refuse any configuration that may carry connotations offensive to good taste and decency," *see* Cal. Code Regs. tit. 13, §§ 206.00(c)(7)(D), the DMV regulations do not take the viewpoint of a requested personalized license plate into account. Because the Court has concluded that California has not historically used Environmental License Plates to communicate messages to the public and that the public does not associate the content of these plates with the State, the fact that the State regulates the plates is not enough to transform their content into government speech. The Court thus concludes that the alphanumeric combinations approved via California's Environmental License Plate program are private speech.

### B.    Forum Analysis

Forum analysis is used to "evaluate government restrictions on purely private speech that occurs on government property." *Walker*, 576 U.S. at 215 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Because "[e]ven protected speech is not equally permissible in all places and at all times . . . the extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius*, 473 U.S. at 799-800.

The Supreme Court has recognized four types of fora: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the nonpublic forum. *Walker*, 576 U.S. at 215-16. A traditional public forum is one "which ha[s] immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 215 (alterations in original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-6 (1983)). A designated public forum exists where "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose," and a limited public forum "exists where a government has reserv[ed a forum] for certain groups or for

the discussion of certain topics." *Id.* (alteration in original) (quoting *Summum*, 555 U.S. at 469; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Finally, a nonpublic forum is one in which "the government is acting as a proprietor, managing its internal operations." *Id.* at 216 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992)).  In both traditional and designated public forums, restrictions on private speech are subject to strict scrutiny.  *Summum*, 555 U.S. at 469-70.  In limited and nonpublic forums, restrictions on private speech must only be reasonable and viewpoint neutral.  *See id.* at 470; *Cornelius*, 473 U.S. at 800.

Most courts that have considered the question have decided that license plates are a nonpublic forum.  *See, e.g.*, *Hart*, 422 F. Supp. 3d at 1233; *Mitchell*, 450 Md. at 310; *Byrne v. Rutledge*, 623 F.3d 46, 54 (2d Cir. 2010).  This Court need not decide the question, however, because Plaintiffs have plausibly alleged that the regulation discriminates on the basis of viewpoint and thus fails both standards of review.  *See Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824 (W.D. Mich. 2014).

In *Tam*, the Supreme Court held that the Lanham Act's prohibition on the registration of disparaging trademarks was viewpoint discriminatory.  137 S. Ct. at 1763.  The case was brought by Simon Tam, the lead singer of a band called "The Slants," who had chosen that name "in order to reclaim and take ownership of stereotypes about people of Asian ethnicity."  *Id.* at 1754 (internal quotation marks omitted).  While the Court split between two different opinions, "all the Justices agreed . . . [that] if a trademark registration bar is viewpoint-based, it is unconstitutional" and that "the disparagement bar was viewpoint-based."  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (summarizing the *Tam* holding).  Justice Alito's opinion reasoned that the bar was viewpoint-based because it "denie[d] registration to any mark that is offensive to a substantial percentage of the members of any group" and "[g]iving offense is a viewpoint."  *Tam*, 137 S. Ct. at 1763 (Alito, J., plurality opinion).  Justice Kennedy's concurring opinion reasoned that the bar was viewpoint-based because, by allowing registration of "positive or benign" marks but not "derogatory" ones, it "reflect[ed] the Government's disapproval of a subset of messages it finds offensive."  *Id.* at 1766 (Kennedy, J., concurring).

California's prohibition on personalized license plate numbers "that may carry connotations offensive to good taste and decency" constitutes viewpoint discrimination under either of these tests. Kohli, who applied for the license plate configuration "QUEER" in an "effort to reclaim the word," *see* Compl. ¶¶ 36-37, is in an analogous position to Tam. The DMV's determination that "QUEER" "may be considered 'insulting, degrading, or expressing contempt for a specific group or person,' and thus 'offensive to good taste and decency,'" *id.* ¶ 37, reflects an assessment of a viewpoint – an assessment that may or may not be correct, depending on the context. This is nothing if not "discriminat[ion] against speech based on the ideas or opinions it conveys." *Brunetti*, 139 S. Ct. at 2299.

This conclusion is further supported by *Brunetti*, which invalidated the Lanham Act's bar on the registration of "immoral[] or scandalous trademarks" because "[i]t too disfavor[ed] certain ideas." *Id*. at 2297 (first alteration in original). The Court reasoned that the statute facially distinguished "between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation. The statute favors the former, and disfavors the latter." *Id.* at 2300. The California regulation's focus on "good taste and decency" likewise sets up a facial distinction between societally favored and disfavored ideas. Under both *Tam* and *Brunetti*, it is therefore unconstitutional.

Gordon argues that the regulation is not suspect because it "constitutionally prohibits certain kinds of configurations" and is "defined by subparts that provide detailed guidance concerning what is offensive to good taste and decency." *See* ECF No. 26 at 26; ECF No. 29 at 16 (internal quotation marks omitted). For example, Gordon argues, denial of an application for a configuration that "is a swear word or term considered profane, obscene, or repulsive" would be constitutional because "the First Amendment does not protect obscene speech, . . . incitement, . . . or fighting words." ECF No. 26 at 27 (citations omitted). Putting aside whether such an application would clearly fall into one of these categories, this argument is rooted in the First Amendment overbreadth doctrine, "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's

11

plainly legitimate sweep.'" *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). But *Brunetti* rejected just such an argument, clarifying that "this Court has never applied that kind of analysis to a viewpoint-discriminatory law." 139 S. Ct. at 2302. "Once we have found that a law 'aim[s] at the suppression of' views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute?" *Id.* (alteration in original) (quoting *Tam*, 137 S. Ct. at 1761).

Because Plaintiffs have alleged that Section 206.00(c)(7)(D) is viewpoint discriminatory, they have plausibly alleged that is facially unconstitutional. Gordon's motion to dismiss is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court DENIES Gordon's motion to dismiss Plaintiffs' complaint.

**IT IS SO ORDERED.**

Dated: July 8, 2020

_____
JON S. TIGAR
United States District Judge